Filed 1/4/21  In re J.H. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.H., a Person Coming Under the Juvenile Court Law. | |
| TUOLUMNE COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>        Plaintiff and Respondent,<br><br>            v.<br><br>D.H.,<br><br>        Defendant and Appellant. | F081238<br><br>(Super. Ct. No. JV8090)<br><br><br>**OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Tuolumne County.  Donald I. Segerstrom, Jr., Judge.

David M. Yorton, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Sarah Carrillo, County Counsel, and Maria Sullivan, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]        Before Smith, Acting P.J., Meehan, J. and DeSantos, J.

D.H. (father) appeals from an order terminating his reunification services at the six-month review hearing regarding his now 18-month-old son, J.H., arguing he was not provided with reasonable reunification services. (Welf. & Inst. Code, § 366.21, subd. (e).)[1] He also challenges the finding the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) did not apply. We affirm the order terminating reunification services but reverse the finding ICWA did not apply.

## FACTUAL AND PROCEDURAL BACKGROUND

Three-month-old J.H. (the baby) was taken into protective custody in October 2019, when social workers investigating a referral found father and his girlfriend, H.P., the baby's mother (mother), both of whom were 19 years old, along with the baby, staying in a home filled with garbage, swarming with flies, and without electricity. Father, who admitted he would test dirty, was arrested for violating probation. Mother tested presumptive positive for methamphetamine, amphetamine, marijuana and MDMA. Two adults living in the home told the social workers father beat mother every day. Mother, however, denied any domestic violence, stating it was not the social worker's " 'business or concern.' "

### *The Petition and Detention Hearing*

The Tulare County Health and Human Services Department (Department) filed a petition alleging the baby came within the provisions of section 300, subdivision (b)(1) based on the home's unsafe and unsanitary condition, domestic violence, and the parents' substance abuse. The detention report stated the Department would ask the parents about their Native American ancestry, but in mother's juvenile probation case and father's prior juvenile dependency case, both were found not to be Indian children under ICWA. The baby was placed in a foster home.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2.

Mother and father were present at the October 11, 2019 detention hearing. Father completed an ICWA-020 "Parental Notification of Indian Status" form, stating he may have Indian ancestry and Choctaw and Creek were the possible tribes. Mother completed the same form, stating she had no known Indian ancestry. The juvenile court did not conduct any inquiry of the parents regarding ICWA at the hearing but found the baby may be an Indian child. The juvenile court ordered the baby detained.

On October 15, 2019, the Department mailed an ICWA-030 "Notice of Child Custody Proceeding for Indian Child" (the ICWA notice) to three Choctaw tribes and five Creek tribes, notifying them of the jurisdiction hearing. The ICWA notice provided father's name, birth date and place of birth. It stated that he was homeless and listed a mailing address. It listed the tribe or band as Choctaw and Creek. The ICWA notice also provided paternal grandmother's name, birth date and place of birth. Paternal grandmother's current address was listed as homeless and a mailing address was provided. Choctaw and Creek were listed as her tribe or band. For paternal grandfather, his name was listed along with his current address as "WASHINGTON STATE"; no further information was known about him and "DOES NOT APPLY" was listed under "Tribe or band, and location." Paternal great-grandmother's name and birth date were listed; her current address was listed as "GENERAL DELIVERY COLUMBIA, CA 95310," and her tribe or band was unknown.

### *The Jurisdiction Hearing*

In the report for the jurisdiction hearing, the social worker stated ICWA does or may apply. Father had completed the ICWA notice, which the Department mailed to all appropriate tribes and government agencies. A continuance of the jurisdiction hearing was required, however, because the notices were not mailed in time to give 10 days' notice of the hearing.

The social worker met with the parents prior to the detention hearing. The parents wanted to "do whatever it took" to get the baby back. The social worker explained

3.

dependency drug court (DDC) to the parents. Father was interested, but mother did not want to participate although she was amenable to attending 12-step meetings. The social worker provided a list of 12-step meetings and blank attendance cards for them to return. The parents were living with paternal great-grandmother; the social worker was concerned because father was removed from paternal great-grandmother's care as a child. The social worker gave them bus passes. Father wanted his aunt (paternal great-aunt) assessed for placement.

After the detention hearing, the social worker met with the parents to discuss visitation. The social worker suggested they come to the office the following morning and she would attempt to set up a visit for that day. When the parents came to the office the following day, they were informed a visit had been arranged for later that morning. Mother tested negative for substances, while father stated he would test prior to the visit. They had not attended any 12-step meetings, as they lost the schedule. They were provided a second copy.

At the visit later that day, father declined to provide a sample for a drug test, even though he was told testing positive would not automatically exclude him from visiting. Father waited in the parking lot while mother visited. At the end of the visit, father again declined the social worker's offer to test, but he came to the end of the visit to meet the foster mother. Thereafter, mother visited regularly, but father did not attend any more visits.

The social worker met with mother prior to her visit on October 18, 2019; mother said father was sick and unable to come. Mother had not attended any 12-step meetings because she lost the schedule. The social worker provided her with another schedule and blank attendance cards. Mother said she had been sober since the baby was taken into protective custody. She and father were still living with paternal great-grandmother but wanted their own place. Mother agreed to participate in the DDC program, and the social

worker gave her an October 30, 2019 intake date, as well as the drug intake coordinator's phone number so mother could set up random drug testing.

A child family team meeting was held on October 23, 2019. Two paternal great-aunts and a paternal cousin attended along with mother. Father was not present; mother said he "declined" to come. Mother was testing negative, visiting, and attending 12-step meetings. Father, however, was not participating in visitation or Department appointments, and was not drug testing. Concern was expressed about the couple living with paternal great-grandmother, as the home did not have running water and was not a sober home. Paternal great-grandmother was arrested in July 2019 on substance abuse charges. At the end of the meeting, it was agreed that paternal great-aunt was the best relative placement option and the baby was placed with her the following day.

Mother appeared at the November 5, 2019 jurisdiction hearing, but father did not, although he was represented by counsel. After mother stated she woke father up for the hearing, but he went back to bed, the juvenile court found he voluntarily absented himself from the hearing. Mother submitted on the reports. The juvenile court found the petition's allegations true and set disposition for November 19, 2019.

### *The Disposition Hearing*

In the disposition report, the Department recommended the baby be declared a dependent and removed from parental custody. It further recommended the parents participate in family reunification services, including DDC. The baby was born prematurely at 33 weeks gestation. He had difficulty holding up his head, but the foster parent did not notice any developmental concerns.

The social worker interviewed mother. She had a difficult childhood with substance abusing parents and an abusive stepmother. She began using marijuana at age 13 and methamphetamine at age 15. From ages 13 to 18, she was in and out of group homes and juvenile hall. Mother met father in juvenile hall when she was 14 years old, but they did not start dating until she was 16. When the baby was born, father became

5.

paranoid that she was cheating on him, which she denied. She denied father was physically abusive but said he screams and breaks things when he is mad. She was frustrated that he would not participate with the Department; he told her he had "PTSD" from the Department's office. She asked him to come to visits and court dates, but he refused.

Father had not made himself available since the detention hearing. Father did not respond to the social worker's text message asking to schedule an appointment to complete his psychosocial information. Mother was attending all offered visits, but father had not visited.

Five of the eight tribes had returned letters indicating the baby was not an enrolled member or eligible for enrollment in those tribes.

Mother appeared at the November 19, 2019 disposition hearing, but father did not. After mother confirmed father knew about the hearing, the juvenile court found father had voluntarily absented himself from the hearing. Father's attorney had unsuccessfully tried to contact him. All parties submitted except father's attorney, who took no position. The juvenile court adopted the proposed findings and orders as well as the reunification plan. The juvenile court found that while mother was making some progress, father "has made no progress whatsoever."

Father's reunification services were comprised of three components: (1) mental health services, including participating in any recommended counseling after a mental health intake; (2) parenting education; and (3) substance abuse services, including a 12-step program, substance abuse testing through the DDC treatment team, completing the DDC substance abuse treatment program, and substance abuse counseling. The parents were offered twice weekly visits totaling four hours per week.

6.

### The Department's Section 388 Petition and Hearing

On March 17, 2020,[2] county counsel filed a section 388 petition on the Department's behalf asking to change the order directing the parents to review, sign and comply with the case plan attached to the disposition report and instead issue an order directing the parents to review, sign and comply with the revised case plan, dated March 10.  As changed circumstances, the Department asserted it received updated information mother had previous involvement with domestic violence and father expected to be incarcerated for six to 12 months, neither of which was addressed in the case plan.  As for best interest, the Department asserted the baby would benefit from mother's involvement in a domestic violence program, "as well as the father's involvement in the Geo Program and Nurturing Parenting Education Program that he may participate in while incarcerated."

The revised case plan, which was attached to the petition, added a service objective for father that he agreed to contact the case managing social worker within 48 hours of his release from custody.  Father's client responsibilities consisted of:  (1) the "Geo Program," which required father, "[w]hile incarcerated," to submit a completed application and, if approved, attend weekly meetings with his assigned case manager, discuss his challenges with substance abuse in order to develop a treatment plan, and participate in any recommended treatment or services; (2) parenting education, which required father to participate in a parenting education program offered through AmeriCorps, which would mail parenting education lessons to him that he was to complete and return; and (3) substance abuse services, including complying with random testing required by the Department, participating in the "Clean and Sober Experience" (CASE) program while incarcerated, which included completing the required reading and assignments in accordance with the program's directives, and attending at least

---

**2**    Further references to dates are to dates in the year 2020.

7.

one Narcotics Anonymous/Alcoholics Anonymous (NA/AA) meeting per week.  In addition, father's visits would be reduced to one in-person visit every two weeks.

The juvenile court ordered a hearing on the petition, which was held on April 7.  Father appeared from the jail via video conference, while mother was not present.  When father's attorney asked father if he received the revised plan, father replied he received it, signed it and sent it back to the judge.  Father reported mother had four more days of inpatient treatment.  Mother's attorney did not know if mother objected to the revised case plan, as she had not had contact with mother.  The juvenile court ordered father's plan modified and continued the hearing as to mother.  Father's attorney asked father if he received any of the packets to work on; father responded he received them "last night."  The juvenile court granted the petition as to father and reserved ruling on the petition as to mother.

Neither father nor mother appeared at the continued hearing on April 14.  The social worker confirmed father had been released from jail, but the juvenile court believed his criminal case had not been adjudicated.  While mother's attorney had not had any contact with mother, the social worker had, and the social worker said mother did not object to modifying the case plan.  Mother's attorney was fine with the modification if mother was.  The juvenile court ordered mother's case plan modified to include domestic violence counseling.

### The Six-Month Review Hearing

The Department's report for the six-month review hearing recommended terminating both parents' services and setting a section 366.26 hearing.  It further recommended the juvenile court find the baby was not an Indian child as described by ICWA.

During the review period, father had limited contact with the Department.  On January 8, a high-risk probation search was conducted at paternal great-grandmother's home, where the parents were living.  Father was arrested and booked into jail, where he

8.

remained for most of the review period. He was released from jail on April 7. Father did not contact the Department upon his release, but the social worker made in-person contact with father at paternal great-grandmother's home on April 21. Father was sentenced the day before on three charges with consecutive sentences totaling one year in jail, with credit for 90 days, and he was required to complete six months of residential treatment. Father told the social worker he would be returning to jail on May 4.

Mother relapsed at the beginning of the review period after maintaining a brief period of sobriety. She was at paternal great-grandmother's home during the January 8 probation search; she had significant bruising, which mother said was from father hitting her and throwing a very hot burrito at her face, as well as red sores from methamphetamine use. Mother subsequently entered residential treatment and graduated from the program on April 11. She then entered a shelter, but she left the shelter on April 16 and reconnected with father. The two were living with paternal great-grandmother. Mother had not resumed engaging with outpatient DDC services, and she tested positive for amphetamine and methamphetamine on April 22.

As of the writing of the report, father had not signed his case plan. On January 13, the social worker met with father at the jail to review his case plan and engage him in services. Father's immediate concern, however, was where mother was and how she was doing. The social worker reminded him the focus of the meeting was to help him reunify with his son. Father asked if visitation could be arranged. The social worker confirmed it could be arranged with the baby; father interrupted and stated, " 'but what about with [mother]?' " Father denied seeing any bruises on mother's faces and if there were some, it could have been from sex because " 'she liked it rough.' " Father later said the bruises may have come from his sister " 'beating' [mother] following her infidelity." Father admitted he and mother usually argue more when they use illicit substances and their arguments occasionally became violent. Father then said their relationship "was none of the social worker's business." At that point, jail staff ended the visit as time was up.

9.

The social worker next met with father at the jail on February 10, after he called to report he remembered why mother had marks on her face. The social worker provided father with the case plan to sign, but he refused to sign it as he wanted more time to review it. Father attempted to blame mother's bruises on poison oak and stated the baby was placed into protective custody because they were living at a home where other people were using illicit substances and engaging in domestic violence. Father said he and mother hid in the bushes to protect the baby from the raid. The social worker reminded father the baby was placed into protective custody due to their substances use and domestic violence. The social worker asked what services father had been participating in while in custody. He said he asked to participate in NA/AA meetings and parenting classes offered through the jail.

The social worker next met with father on April 21, at paternal great-grandmother's home. Father said he was released from jail four days ago, but paternal great-grandmother said he had been out for about two weeks. Asked why he never reached out to the Department to engage in services, father said he was waiting for the right time to call because the social worker did not respond to his calls. The social worker, however, noted she had received only one phone call from father the entire review period, on February 10. Father was asked to provide a urine sample; father said he was clean but could not provide a sample. The social worker asked the parents to come to the Department the following day to provide a urine sample. The next day, father stated he could not provide a urine sample. A swab test was conducted, which indicated he was positive for amphetamines and methamphetamine. Father left the Department's office before the social worker could meet with him.

Father did not participate in any of the services that were part of the original case plan. Father did not visit the baby until he requested visits on February 10. He had two visits at the jail on February 28 and March 13, but in-person visits were suspended on March 18 due to COVID-19. Father had a video visit with the baby on April 8, but

10.

since then, he had not contacted either the Department or paternal great-aunt to arrange for in-person or video visits. The social worker noted father demonstrated little motivation to reunify with the baby. Instead, he continued his lifestyle of using illicit substances and participating in illegal activities, which resulted in his incarceration. Moreover, despite the Department's attempts to engage father in services, he demonstrated no insight into why the baby was placed into protective custody.

Letters from the three tribes that had not previously responded were attached to the report. The letters indicated the baby was not an enrolled member or eligible for enrollment in their tribes.

A contested review hearing was held on May 29; father was present in custody. The Department submitted on the reports, as did the baby's counsel. Mother testified on her own behalf. Since she left inpatient treatment, she watched around five NA/AA online meetings since in-person meetings were not being held. Mother was living with paternal great-grandmother but hoped to move out soon. She was high and drunk when she told the social worker on January 8 that father hit her. She left the shelter and went back to father because she did not want to be at the shelter and alone. When she came back to the shelter, they would not let her back in due to the coronavirus and told her to get her stuff and leave. She had nowhere else to go so she called father and asked if she could come over.

Father's attorney called the social worker to testify. She took over the case in January and understood father was "pretty uninvolved in the beginning stages of the case." She was present when father was arrested in January and contacted him at the jail on January 13 to introduce herself, review the case plan, and see what services were available in the jail. She did not bring the case plan with her, but she talked with father about the case plan components, which at that time was a DDC case plan. When she met with father in February, she brought the original case plan with her, but she did not have a copy to leave with him. The social worker did not think he had a copy of the case plan

11.

with him in jail. The case plan was modified in April to provide services that were available to father in jail. The modified plan was delivered to him in jail, but she never got a signed copy back.

According to the social worker, the components of the modified case plan were participation in NA or AA meetings and enrolling in both the "GEO program," which was alternative-to-violence education, and a domestic violence program. When asked if she verified these components were available to father in jail before modifying the case plan, the social worker responded he was able to enroll in the "GEO" and domestic violence programs while in jail, but he could not participate in them until he was released; these programs would be monitored by probation. He could participate in NA and AA meetings while in jail. The social worker did not know father's "out date" when she modified father's case plan, but she believed it was before the six-month review hearing as father and his family told her he would be released sometime in April. She did not verify that with the jail, however, and she did not know father would have to return to jail after April. The social worker confirmed at trial the section 388 petition indicated the Department knew father would be incarcerated for six to 12 months.

Father did not talk about wanting to visit the baby until the social worker's February visit to the jail. He had never visited to that point. Father's court-ordered visits were twice weekly for a total of four hours, but visits at the jail were set up for one 30-minute visit every other week. He had two visits at the jail, on February 28 and March 13, before the jail suspended them due to the coronavirus. After father's release from jail on April 7, he did not contact the Department to set up visitation, although he reached out to the caregiver and had a video visit on April 8. That was father's last visit with the baby.

Sometime after April 22, the social worker saw father once at paternal great-grandmother's house to advise he and mother of the recommendation to terminate services. The discussion upset father and the conversation ended when father went inside

the house. During that contact, father said he was going back into custody on May 4. The Department had not offered father any visits since he returned to custody as the Department was not doing in-person visits at the jail due to the coronavirus. When asked if there was an alternative to in-person visits at the jail, the social worker responded it was challenging at the baby's age and she did not know that a phone call visit was appropriate. The social worker was not aware video visitation was available at the jail during coronavirus, and she denied the Department's position was to suspend visits for every incarcerated parent during coronavirus. The social worker admitted there were other alternatives available, such as video visitation mentioned by mother's attorney, but it was "kind of case-by-case basis if visitation is occurring or not right now" at the jail.

On cross-examination, the social worker testified father's initial case plan was not appropriate given his incarceration, so the Department modified the case plan to what he could do in the jail. Father did not participate in his initial case plan because he "has been pretty unavailable to Child Welfare Services through the entirety of the case." The social worker explained: "He's difficult to contact. He does not reach out to contact us. He lacks insight of why [the baby] was brought into care, so it's been challenging to engage him in services." He did not engage in any case plan services before he went to jail or sign the case plan because he did not come to court. He only appeared when he was in custody.

Father initially was set up for twice weekly visits, but he was taken off the schedule because he never showed up. The Department's policy in that circumstance is to take the parent off the schedule, so the child is not transported for a visit that does not occur. To get back on the schedule, the parent needs to reach out to the Department. Father did not do so until she visited him in jail in February, when she set up visits. When he got out of jail, he did not contact the social worker to set up visits. When father did visit, there were no concerns.

13.

The social worker believed there was a substantial risk of detriment if the baby were returned to father, as during the short time father was out of custody, he "was in substance use," living with paternal great-grandmother in a home that was not safe for a child, lacked insight into why the baby came into care and could not articulate the unhealthy relationship he had with mother. The social worker did not think there was a substantial probability the baby could be returned to father if the court ordered six more months of services due to father's pattern of behavior when he was out of custody—he would live with paternal great-grandmother and resume drug use, and there was no change or insight.

The social worker did not explain to father why the visits stopped in March and she was not sure if anyone else did. Father told the social worker he did not participate in NA or AA meetings at the jail.

In closing argument, father's attorney argued the Department did not offer father reasonable services given his incarcerated status. While father asked for visits in January and February, they were not provided until the end of February, and when the jail ended in-person visits, the Department did not investigate alternatives. The attorney further argued no one went over the modified case plan with father or followed up on it, and while the case plan was supposed to be specific to the resources available at the jail, two of the three components were not available to him until he was released from custody. In addition, no one followed up on whether NA or AA meetings were offered at the jail during the coronavirus pandemic. Finally, the six-month report did not discuss father's progress in the modified case plan, and instead discussed his lack of progress in the initial case plan.

In response, county counsel argued the Department offered father reasonable services since the start of the case, but he simply chose not to engage in them. Father could have started visits in January, but he did not take the opportunity to do so, and

14.

instead waited until February to request them. County counsel further argued the Department could not force father to do the services it was offering.

The juvenile court took the matter under submission and issued its ruling at a June 2 hearing. In ruling on whether the Department showed by clear and convincing evidence father was offered reasonable services because the services were not tailored to his situation in jail, the juvenile court noted there was a significant period of time father was out of custody and "not only did he not participate, he had almost no contact at all with Social Services." The juvenile court found by clear and convincing evidence the Department offered reasonable services to father and he chose not to participate in them, explaining: "There's significant case law to the point that the Department can offer services, but it can't make the parent participate. And the question is whether … the services that were offered were reasonable. And the Court finds that they were."

The juvenile court further found father made no progress in alleviating or mitigating the causes necessitating placement, and the only service he indicated any interest in was when he asked in February to visit the baby. While the Department made efforts to provide visits, shortly thereafter the coronavirus pandemic hit and all visitation stopped, which was not the Department's fault. The juvenile court noted it had issued an order requiring the Department to "go through each individual case and try and tailor the services as best as possible to the parents." The juvenile court again stated it found the Department offered father reasonable services.

With respect to whether there was a substantial probability the baby may be returned to father by the 12-month review hearing, it was clear to the juvenile court father had made absolutely no progress, and based on his absolute lack of interest and failure to participate in the services that were offered to him when he was out of custody, there was no chance the baby would be returned to him by the 12-month mark. The juvenile court, however, found there was a substantial probability the baby may be returned to mother.

15.

The juvenile court continued mother's services for an additional six months but terminated father's services.

**DISCUSSION**

## I.    *Reasonableness of Services*

Father contends the order terminating his reunification services must be reversed because substantial evidence does not support the finding he was offered reasonable services. Specifically, he argues his services were unreasonable because it was impossible to comply with the majority of the modified case plan's requirements, as he was unable to access two of the three requirements while incarcerated, and the Department failed to discuss the modified plan's requirements with him or verify his release date to ensure he could comply with them before the six-month review hearing. Father further argues the social worker failed to provide him with court-ordered visitation.

### A.  *Legal Background*

The purpose of reunification services is to place the parent in a position to gain custody of the child. (*In re Karla C.* (2010) 186 Cal.App.4th 1236, 1244.) To that end, the Department must devise a reunification plan tailored to the unique needs of the family and make a good faith effort to help the parent access the services the plan provides. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) "The adequacy of reunification plans and the reasonableness of the [Department's] efforts are judged according to the circumstances of each case." (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.)

The reasonableness of reunification services is assessed by its two components— content and implementation. (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1362.) The content of the plan or, in other words, the nature of the services offered, is reasonable if it properly identifies the family's problems and offers services targeting those problems. (*In re Riva M.*, *supra*, 235 Cal.App.3d at p. 414.) The implementation of

16.

the services plan is reasonable if the supervising agency maintains reasonable contact with the offending parent and makes reasonable efforts to assist in areas where compliance is difficult. (*Ibid.*)

By statute, the juvenile court may not terminate a parent's reunification services at the six-month review hearing if it finds "reasonable services have not been provided" to the parent. (§ 366.21, subd. (e).) Thus, if the juvenile court finds reasonable services have been provided, it may terminate a parent's reunification services. Moreover, the juvenile court may refer the matter for a section 366.26 hearing if it finds by "clear and convincing evidence that reasonable services have been provided or offered" to the parent. (§ 366.21, subd. (g)(1) & (2).) While the juvenile court did not set a section 366.26 hearing since it continued mother's services, the juvenile court found by clear and convincing evidence father had been offered reasonable services. (See *Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 595 [at the six-month review hearing, the Department must prove it provided reasonable reunification services by clear and convincing evidence]; *In re Monica C.* (1995) 31 Cal.App.4th 296, 306.)

We review the juvenile court's reasonable services finding for substantial evidence, i.e., evidence that is reasonable, credible and of solid value. (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238.) In doing so, we must account for the clear and convincing standard of proof. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) The question before us is "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Ibid*.) We "view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id*. at pp. 1011–1012.)

17.

## B. *Forfeiture*

The Department contends father forfeited his claim that the modified case plan was inadequate because it included services that were not available to him at the jail. We agree.

The reunification plan's content is set forth at the disposition hearing and may be subsequently modified. (§ 361.5, subd. (a).) A parent seeking to challenge the content of the reunification plan must do so by direct appeal from the juvenile court's order approving the case plan or by filing a section 388 petition to modify it. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 47.) Failure to do so forfeits the issue for appellate review. (*Ibid.*) A parent seeking to challenge the agency's efforts to implement the case plan may do so by a timely appeal from the juvenile court's finding services were reasonable.

In this case, father challenges the content of the modified case plan, which was ordered into effect when the juvenile court granted the Department's section 388 petition as to father on April 7. Father, however, did not object to the modified case plan at the hearing on the section 388 petition; moreover, he informed the juvenile court he had received the plan, signed it and returned it to the judge. Based on this, the juvenile court granted the section 388 petition modifying father's plan. No appeal was taken from that order.

Reunification is a collaborative effort and a parent is presumed capable of complying with a reasonable services plan. (*In re Christina L.* (1992) 3 Cal.App.4th 404, 415.) Consequently, the parent is responsible for communicating with the agency and participating in the reunification process. (*In re Raymond R.* (1994) 26 Cal.App.4th 436, 441.) If father felt during the reunification period that his services were inadequate, he "had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan." (*Christina L.*, *supra*, 3 Cal.App.4th at p. 416.) A parent may not "wait silently by until the final reunification review hearing to seek an extended reunification period based on a perceived inadequacy in the reunification services occurring long

18.

before that hearing." (*Los Angeles County Dept. of Children etc. Services v. Superior Court* (1997) 60 Cal.App.4th 1088, 1093.)

Father's claim of error—that the modified case plan adopted on April 7 required him to complete services he could not participate in while incarcerated—deals directly with the content of the case plan adopted at the section 388 hearing. As such, the issue is not cognizable in this appeal. (*In re Julie M.*, *supra*, 69 Cal.App.4th at p. 47.)

### C. Reasonable Services Were Provided

With respect to implementation of father's case plans, father asserts the social worker failed to discuss the modified case plan's requirements with him, assist him with accessing services, and provide him with court-ordered visitation while incarcerated.

Father contends two of the three case plan components were not available to father during his incarceration. As the Department points out, while the social worker agreed to this assertion at the review hearing, the record shows this was not the case. The modified case plan included three elements—substance abuse treatment, parenting education, and domestic violence counseling. Each of these elements had one or more specific components. For substance abuse treatment, father was to enroll in the CASE program and attend at least one NA/AA meeting per week. Father agreed NA/AA meetings were available in the jail, but he did not attend them. The parenting education component required father to complete packets that were mailed to him and return them by mail. Father admitted at the April 7 hearing that he received the packets in the mail; apparently, he did not complete them. The third component, the "GEO" program, stated father would submit a completed application, but he apparently did not do so. While father complains that the social worker did not discuss the modified case plan's components with him, he acknowledged receiving the plan and he knew what was required of him. Father simply did not participate.

The modified case plan required father to contact the social worker within 48 hours of his release from custody. Although father was released from jail on April 7,

19.

apparently after the hearing on the section 388 petition, father did not contact the social worker. Instead, he returned to his familiar pattern of living with paternal great-grandmother, abusing substances, and actively avoiding contact with the Department. The problem here was not the Department's failure to offer father services, but rather his failure to engage in them or even to come to court and visit his son, unless he was in custody.

As for father's contention he was not provided visitation while in jail in accordance with his case plan, we note the standard for assessing whether reunification services were adequate is not whether the services provided were ideal, but whether they were reasonable given the circumstances in each case. "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

Here, any failure to provide court-ordered visitation while father was in jail was reasonable under the circumstances of this case. Father did not request visits with the baby until February. The social worker scheduled the visits and they began within two weeks. While the two visits father received took place every other week for 30 minutes, rather than twice a week for four hours as provided in the initial case plan, that plan gave the social worker discretion to modify visits in the baby's best interest and dependent on the parent's progress in services. Moreover, despite the social worker's testimony that visitation had never been modified, the modified case plan reduced father's visits to biweekly beginning March 10. Given this change and the baby's young age, it was not unreasonable to provide father visits at the jail less frequently and for a shorter time than stated in the initial case plan.

When the jail suspended visits due to the coronavirus pandemic, father missed at most one visit before he was released from custody on April 7. After that, he did not

20.

contact the social worker to arrange visits, either when he was out of custody or after he returned to custody on May 4. Although the Department apparently could have arranged for video visitation in the jail, that it did not do so is not unreasonable given the baby's age. As the Department asserts, an eight-month-old baby is not benefitting from or substantially bonding with a parent during a video visit in a jail setting and 30 minutes of participation is reaching, if not exceeding, the baby's capacity, especially where the baby had not visited with or even seen father for four months due to father's refusal to visit, and thus had no real relationship with him. Moreover, as the juvenile court noted, it had ordered the Department to tailor the services as best as possible considering the coronavirus pandemic. The evidence shows the Department did just that with respect to father's visits.

Based on the above, we find that substantial evidence supports the juvenile court's finding that the Department provided reasonable services to father. Father's "real problem was not a lack of services available but a lack of initiative to consistently take advantage of the services that were offered." (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.)

## II. ICWA

Father contends the court erroneously found the baby was not an Indian child within the meaning of ICWA. He asserts the ICWA notice sent to the tribes failed to include information father or his relatives may have been able to provide, but nothing in the record shows that father's relatives were interviewed or why the Department was unable to provide the information.[3] The Department concedes extended family members

---

[3] Father also questions why the ICWA notice listed his mailing address as 357 Barretta St., Apt. A, Sonora. This address, however, was listed on the police report of his October 8, 2019 arrest, and was the address used to mail him the dependency petition on October 17, 2019.

21.

may not have been interviewed and therefore remand is required for further inquiry and notice as required by ICWA.

ICWA requires notice to Indian tribes "in any involuntary proceeding in state court to place a child in foster care or to terminate parental rights 'where the court [or social worker] knows or has reason to know that an Indian child is involved.' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 8; 25 U.S.C. § 1912(a); accord, § 224.3, subd. (a).) The tribe to which the child belongs, or in which the child may be eligible for membership, must receive "notice of the pending proceedings and its right to intervene." (*In re H.B.* (2008) 161 Cal.App.4th 115, 120; accord, § 224.3, subd. (a)(3)(A).)

The juvenile court and the Department have an "affirmative and continuing duty to inquire" whether a child in dependency proceedings "is or may be an Indian child." (§ 224.2, subd. (a).)[4] If the court or social worker has "reason to believe" an Indian child is involved, the social worker must, as soon as practicable, interview the parents and extended family members to gather the information required to determine the possible Indian status of the child. (§ 224.2, subd. (e)(1).)[5] Further inquiry includes, but is not

---

**4** We note that "[i]n 2016, new federal regulations were adopted concerning ICWA compliance. [Citation.] Following the enactment of the federal regulations, California made conforming amendments to its statutes, including portions of the Welfare and Institutions Code related to ICWA notice and inquiry requirements. [Citations.] Those changes became effective January 1, 2019 …, and govern here." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048.)

**5** Section 224.2, subdivision (e)(1) provides: "If the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child, the court, social worker, or probation officer shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable. [¶] (1) There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not

limited to:  (1) interviewing the parents, Indian custodian, and extended family members to gather the information required in paragraph (5) of subdivision (a) of section 224.3;[6] (2) contacting the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member, or eligible for membership; and (3) contacting the tribe(s) and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility.  (§ 224.2, subd. (e)(2).)

If the inquiry establishes a "reason to know" an Indian child is involved, notice must be provided to the pertinent tribes.  (§ 224.3, subds. (a), (b).)[7]  ICWA notices "shall include," among other things, the identifying information for the child's biological parents, grandparents, and great-grandparents, to the extent known.  (§ 224.3, subd. (a)(5)(C).)  The notices should "provide the Indian tribe with all available

---

establish, the existence of one or more of the grounds for reason to know enumerated in paragraphs (1) to (6), inclusive, of subdivision (d)."

[6]      Section 224.3, subdivision (a)(5) lists the information to be included in an ICWA notice, such as the name, birth date and birthplace of the Indian child, if known; the name of the Indian tribe; and the names and other identifying information of the Indian child's biological parents, grandparents, and great-grandparents, if known.

[7]      Section 224.2, subdivision (d)(1) describes six circumstances providing reason to know an Indian child is involved:  "(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child. [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village. [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child. [¶] (4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child. [¶] (5) The court is informed that the child is or has been a ward of a tribal court. [¶] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe."  (§ 224.2, subd. (d).)

information about the child's ancestors, especially the ones with the alleged Indian heritage." (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 703.) The Department must send notice of all hearings that may culminate in an order for foster care placement, termination of parental rights, or preadoptive or adoptive placement, until the court determines that ICWA does not apply. (§§ 224.2, subd. (i)(1), 224.3, subd. (b).)

The juvenile court may find ICWA does not apply when the Department's further inquiry and due diligence were "proper and adequate" and there is no "reason to know" whether the child is an Indian child. (§ 224.2, subds. (i)(2), (g).) Even if the court makes this finding, the Department and the court have a continuing duty under ICWA, and the court "shall reverse its determination if it subsequently receives information providing reason to believe that the child is an Indian child and order the social worker or probation officer to conduct further inquiry." (§ 224.2, subd. (i)(2).)

Here, the Department assumes father's statement that he may have Cherokee or Creek ancestry creates a reason to believe the baby may be an Indian child. In that situation, as we have stated, the Department's inquiry must include interviewing the parents, Indian custodian, and extended family members to gather the information about tribal affiliations and ancestral identifying information required for formal notice under section 224.3. (§§ 224.2, subd. (e), 224.3, subd. (a)(5).) The Department concedes the record shows it did not conduct such an inquiry. While the Department apparently interviewed father, there is no indication the social worker attempted to contact father's extended family members, who were accessible to the Department, to gather the pertinent ICWA information.

Cherokee and Creek tribes were provided with known identification information concerning the baby, parents, paternal grandparents and paternal great-grandmother. Although formal notice was not yet required, and the tribes did not identify any additional information that was necessary to make a membership or eligibility determination, we cannot know if any of father's accessible relatives would have

responded with ancestry information that would have assisted the tribes in determining whether the baby is a member or eligible for membership.

Therefore, the juvenile court's order finding that ICWA did not apply—based on the court's general adoption of the Department's recommendations—was not supported by substantial evidence. (§ 224.2, subd. (i)(2) [ICWA findings "subject to reversal based on sufficiency of the evidence"]; *In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1467 [reviewing ICWA findings for substantial evidence].) The court had no facts on which to base an ICWA finding in the absence of information about the Department's investigation. (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1198.)

On remand, the juvenile court shall ensure the Department further investigates father's claim of Indian ancestry. (§ 224.2, subds. (a), (e).) The court must then decide whether the information amounts to "reason to know" that the baby is an Indian child, thereby triggering the notice requirement. (25 U.S.C. § 1912(a); § 224.3, subds. (a), (b).)

## DISPOSITION

The order terminating father's reunification services is affirmed. The matter is remanded for the juvenile court to vacate its finding that ICWA does not apply and to (1) direct the Department to further investigate father's claim of Indian ancestry and (2) decide whether the inquiry reveals reason to know the baby is an Indian child. If the court determines that there is reason to know the baby is an Indian child, the court shall direct the Department to send notice to the pertinent tribe(s). After the Department updates the juvenile court on its inquiry and responses from the tribe(s), the juvenile court shall determine whether ICWA applies to the baby. If the juvenile court determines ICWA applies, it shall proceed in conformity with ICWA and related California law.